## EAGLE v. PETTUS.

### Opinion delivered July 14, 1913.

1. SPECIFIC PERFORMANCE—CONTRACT WITH OPTION TO PURCHASE—EVIDENCE.—Evidence of an extension by parol of a written lease with an option to purchase, which has expired, in an action to enforce the same by specific performance, must be clear and unambiguous, and must be either admitted or proved with a reasonable degree of certainty. (Page 321.)

2. SPECIFIC PERFORMANCE—ABANDONMENT—EVIDENCE.—In a suit to enforce a lease with an option to purchase, the evidence held to show an abandonment or rescission of the contract, so that the tenant held as tenant and not as purchaser under the same. (Page 322.)

3. STATUTES OF FRAUD—SALE OF LAND—NATURE OF TITLE.—Where the appellee continued in possession of lands as tenant and not as purchaser, under a lease with an option to purchase, which had expired, and attempted to prove an extension of the same by parol, the appellant can not invoke the statute of frauds, because there was no equitable title in the appellee. (Page 323.)

Appeal from Lonoke Chancery Court; *John E. Martineau*, Chancellor; reversed.

### STATEMENT BY THE COURT.

On the 15th of January, 1890, L. W. Monroe entered into a contract with George Pettus and Pete Pettus whereby Monroe agreed to sell a certain tract of land in Lonoke County for the consideration of $1,500, evidenced by a promissory note for that amount, with interest from maturity at 10 per cent per annum. The contract pro-

vides "that George Pettus and Pete Pettus shall pay all taxes assessed against the land each year and keep the land and premises in good repair and cultivate the same in a good and husbandman-like manner, and pay to L. W. Monroe on the 1st day of November, 1890, and each year thereafter the sum of of $150 until the year 1894, and on the 1st day of November, 1894, if the said George Pettus and Pete Pettus shall have paid on the 1st day of November of each and every year from 1890 unto the year 1894 the sum of $150 and all taxes assessed against the land, and shall on said 1st day of November, 1894, pay to said L. W. Monroe the sum of $1,500, as well as the $150 interest for 1894, then the said L. W. Monroe shall execute and deliver to George Pettus and Pete Pettus a deed conveying said land. It is the intention of L. W. Monroe to let and lease to George and Pete Pettus said land with the privilege of paying for the same and buying it in five years, and the said sum of $150 is the interest on the $1,500." If they shall fail to keep the place in repair and pay all taxes, and the sum of $150 in each and every year on the first day of November in each and every year from 1890 to 1894 inclusive, "then and in that event the obligation of said L. W. Monroe to make them a deed shall cease, and the sum of $150 a year and taxes assessed against the land, being a fair and reasonable rent for the land, the payment thereof shall be considered the rent thereof for such years as the same shall be paid."

On the 2d of May, 1912, George Pettus instituted this suit against the appellants. He set up the contract in his complaint and alleged that under the contract he was to have title when the $1,500 note was paid; that he was put in possession of the land under the contract, and has held possession thereof ever since; that when the $1,500 note came due he could not pay it, but Monroe told him he could have as long as he wished to pay it; that after he had made valuable improvements on the land and cleared up fifty acres or more and the place was bringing in a better income Monroe suggested that he

had better pay $50 on the principal every year, which he did until Monroe died; that he could have got the money to pay the debt if Monroe had demanded it, which he never did, but, on the contrary, gave him to understand that he preferred the interest; that Monroe died in 1911, and thereafter he (Pettus) tendered the heirs of Monroe, the defendants, the money due and demanded a deed, but they refused to accept the money and refused to make him a deed; that Monroe kept the account between them. Pettus alleged that he was ready to pay whatever may be found due upon the land. He asked that the court declare what was due, and that upon its payment the plaintiff be given a deed.

The defendants (appellants) answered, alleging that the plaintiff held the land under the contract until the year 1901, when he was behind in the payment of interest in the sum of $846.29; that he had paid no part of the principal; that at that time the contract of purchase was abandoned by the plaintiff without his ever having paid the balance of the interest or any part of the principal; that thereafter the plaintiff occupied the land as a tenant. They denied the other allegations of plaintiff's complaint, and alleged that the claim set forth by him was a stale demand and that it would be inequitable to permit the plaintiff to assert a claim under a contract more than twenty-two years after its execution and after the death of the party with whom it was made.

There is no dispute about the contract, and that appellee took possession under it. His testimony, in substance, is that he paid the interest every year for five years. At the expiration of five years he went to Monroe and told him if he wanted his money he could get it. Monroe said: "You need not be uneasy; all I want, George, is my money. You just go ahead, and as long as you pay me my money you will stay there, and I will never bother you."

Appellant shows that he had cleared fifty or sixty acres on the place since he had lived there. He did what little building there was, fencing and keeping the place

up. He paid $150 interest every year for thirteen years. After thirteen years Monroe said he thought appellee should pay a little more to begin paying something on the place. Monroe said $50 more paid every year on the place would make appellee more able to pay the main note when Monroe got ready. Fifty dollars more was to be paid yearly on the main debt. After that he began paying Monroe $200 every year.

Appellee went to see Monroe when in poor health and Monroe requested appellee to come around and "straighten up." He went back afterward to see him, but Monroe was not able to attend to business that day, and appellee didn't get to see him again.

There were about thirty acres cleared on the place when appellee went on it and commenced clearing it up, and he cleared up a little every year.

Appellee states that after the death of Monroe he didn't go to Monroe's son-in-law, Will Oldham, and tell him that he wanted to buy the land in controversy. He states that after Monroe's death he gave Oldham a note for the rent for 1911. "It was an interest note that I gave him." He told Mr. Monroe in the presence of his daughter, Mrs. Parker, that he would get the contract and bring it back to him for a settlement. That was the first time Monroe ever mentioned to witness about bringing up the papers and straightening up. Monroe always said, "You bring up your papers and let's straighten."

Witness had heard that somebody had bought the place. Monroe told witness as follows: "You can sell the place if you want to and all that is over what you owe me you can have."

When appellee gave the rent note to Oldham in 1911 "he didn't tell Oldham that he claimed the land as a purchase, but that was what he was doing. The note that he gave Oldham was not for rent but for interest note. It was all interest except $50 that was to be paid on the principal. Appellee testified that in the spring of 1905 he didn't enter into a contract with Monroe to lease the property for five years, and he stated that

Monroe said "I will give you five years more." Appellee stated that that was what Monroe did all the time. When he went to him and told him that he would pay it out Monroe said, "Go ahead, and I will give you five years longer." "When this was up he told me he would give me five years longer." Monroe never paid appellee for any improvements he put on the place.

One witness testified that he went to Monroe in the fall of 1909 and wanted to buy the land and Monroe told witness that he was under contract with Pettus for the land. Monroe told witness to go over to see Pettus and get him to go and make a quitclaim deed and he would turn him over all the papers he held against him. Witness went and told the negro and urged the negro to do so, but could not get him to say what he would do.

Another witness testified that he tried to buy from Monroe three acres of the place occupied by George Pettus, which joins witness on the west, for the purpose of building on it, and that Monroe informed witness that he could not give witness any satisfaction about it "because he had sold the place to George Pettus and George Pettus had been paying him up the interest very well, and that it was just the same as rent and he couldn't sell it to me." He told witness that he had sold the place to Pettus, and that there had been several men there after him for it, but he didn't have anything to do with it; that George had been paying the interest up; it was just the same as rent. He told witness that Pettus "had been keeping the interest up." He said that "George had been on the place a good while and he didn't care to dispossess George of it; there had been several there after it." Witness never named it to George Pettus. Witness stated that a month or two ago Pettus came to his house and told witness that he might be wanted as a witness. Then witness says he was at church when he and Pettus were talking. He told Pettus what Monroe had said. He said that they got to talking and witness brought up the question. He knew it was on Sunday, but couldn't tell exactly what time a day it was, whether

it was before or after dinner; it had been about two months previous to the time witness was testifying.

W. W. McCrary testified that Pettus had been one of his customers for about fifteen years. Witness paid off a number of the interest notes to Monroe. He never had any talk with Monroe in regard to it but understood from Pettus that the payments were interest on the place.

Another witness testified that in the spring of 1909 he went to Monroe to buy two acres of a piece of land that George Pettus was in possession of for a graveyard. Monroe told witness that he didn't know whether he could sell the land or not right then. The reason was that he had contracted or made a sale to George Pettus about nineteen or twenty years ago when he sold the land for $1,500, and Pettus had stayed on the land and was improving it and the land had become more valuable several years after that, and he told George that he thought he ought to pay more as he had not paid the $1,500. Monroe said he just charged him rent, and he thought it was worth more; that he would charge him $200 and call it rent, he said, on his books. Monroe told witness that he would have to get a deed from George; for witness to "go to George and get him to bring his wife up there and sign their right away."

On cross examination this witness testified:

Q. He told you to go and see George, and it would be all right if it was all right with George? A. Yes.

Q. You didn't go to see George? A. No.

Q. Why was it, after you found a way pointed out to you to get that graveyard, you abandoned the idea and never pursued it? A. To tell you the truth, he went on talking and said he would not like a graveyard on his land; he said it would ruin the sale of it.

Q. Why did he care about the sale of it, if he had already sold it? A. I don't know about that.

Several witnesses testified to the effect that Major Monroe's business was that of loaning money, selling property, renting land, etc., and that his policy was to let the debts run along as long as they were secured, if

the interest was paid. "He was satisfied with the interest being paid promptly." He didn't insist on payment of the principal when it became due if the party was paying the interest promptly.

W. P. Fletcher, a witness on behalf of appellants, testified that he had lived at Lonoke for many years, and was in the real estate business. He talked with Pettus and Monroe about the land. The way the conversation came up was this: "I said to George, 'Why don't you get Major Monroe to build you some houses? You are living here until you have just gone out of doors.' George said, 'Yes, sir; but I can't get him to do it.' I said, 'I will see him the first time I get a chance to see him about it, and see if he won't build you some improvements here.' A few days after that, I don't know how long, but it was fresh in my mind, Major Monroe and George Pettus were in my house for some reason, and I got at him at once in this language: 'Major, why don't you build this old negro some houses on your place there? He has absolutely lived there until he is just living out of doors. They have gone to nothing; they have gone to rack.' He said, 'Why, he is paying me my little rent for the place, with the understanding that he keep up the improvements himself.' This statement Major Monroe made in George's presence. This was some time in the last three years, in my office here in town. The three acres that Nelson Herron said he wanted to buy from Mr. Monroe, to build on, is half a mile away from his improvements. In the last ten years there have been no substantial or permanent improvements made on the place. When I spoke to George down at the place about the Major building him some houses and make some improvements on the place he said he had been at Major Monroe to build him some houses and make some improvements. He didn't tell me he was renting from Major Monroe."

W. K. Oldham, a son-in-law of Monroe, was administrator of the estate, and was interested in the litigation to the extent that his wife was one of the heirs. He

testified that in the spring of 1907 he was looking after the land in controversy for Major Monroe. Major Monroe told him that at one time he had sold it to George Pettus, but that the contract had already been forfeited and that George was then renting it. He said that Monroe stated that George had failed to bring his rent note, and wanted witness to see about it and to get the old contract from George, and return it with the rent note, and to have George sign the note. Witness saw Pettus, told him what Monroe wanted, and asked him to fix the rent note, or they would rent the place to somebody else. Pettus replied: "Well, now, Mr. Oldham, I have got another year's lease on that. I had it leased for five years, and I have got another year, and I thought any time would do to go to see Mr. Monroe." Pettus further stated, in regard to the old contract, that "his boy had gone away and carried it off in a trunk, and that he could not find it, and that is why he had not delivered it to Major Monroe long ago; that that contract was cancelled, and that he was renting the land from the Major."

Witness continued: "I afterward saw Monroe, and he said George had been up and given his rent note for that year." After Monroe's death, in going through his papers, witness found that Pettus had not given any rent note for 1911. Major Monroe died in March, 1911. Witness drew up a rent note for that year, and Pettus signed it, and that fall it was paid through Mr. McCrary. Along about Christmas, Pettus was over at witness's place, and said that he wanted to stay on the place where he was living and wanted to make some arrangements about buying it. When demand was made on Pettus for the rent note of 1911 he didn't claim in any way that he held the land under purchase. This witness explained that Monroe was methodical in his business methods; that he kept all of his papers in a roll-top desk or in his iron safe, and that there was an old desk there called the "secretary." In his business transactions witness never knew Monroe to keep any valuable papers in that old "secretary." Witness had been married nineteen years, and had an

intimate knowledge of Major Monroe's business trans-
actions; was at his house often and knew where he kept
his business papers.

Another witness, a grandson of Major Monroe, stated
that he was assistant to the executors in getting up the
inventory and papers of Major Monroe after his death.
He stated that he found no live papers or valuable papers
except those that were contained in the safe or roll-top
desk, except two or three notes that had been turned over
to lawyers for collection. He found the note and mort-
gage, the instruments shown here, in the old "secretary."
He never saw anybody use it or go to it for anything as
long as he was around his grandfather's. He found
the note and contract in evidence in a pigeonhole in his
old "secretary." The package was apparently very old,
being yellow and filled with dust. It was wrapped in a
loose bundle with some old inventories showing cotton
sales and some receipted bills. The package was loosely
bound. The papers in that package were dated 1891,
1892, 1893, and, as witness supposed, in 1894. Witness
discovered this old contract and note in an old bundle of
papers that "ran back seventeen or eighteen years."
There was not a single paper of Major Monroe's estate in
that old "secretary" that was a live matter, and not a
mortgage or any other paper that represented an asset
of his estate.

Mrs. Elcan testified that she was a daughter of Major
Monroe, and kept his books for many years. She says
that the books show that on the 12th day of December,
1901, there was a balance against George Pettus of
$846.29. Pettus owed her father that sum on that date.
That account was dropped, and a new account started in
1902 showing the transactions after December 1, 1901.
The $846.29 was never carried into the account of 1902.
Her father dropped it because he thought it was useless
to carry it on; he didn't do anything with it. Pettus was
never charged with taxes on the land after 1901. On
page 159 of the ledger, there is this entry in witness's
handwriting: "To rent above land for 1905, $250. Pet-

tus leased above land for five years for $250 a year, and
he is to keep up the place and pay taxes.''

Witness heard Pettus make the contract. She didn't
remember exactly for how many years, or the land, but
did remember Pettus making the contract with her
father, and her father raising the rent. The memorandum on the ledger was made by witness on that book
some time between January 17 and August 7, 1905. Witness stated that for a number of years prior to her
father's death, George rented the land like anybody else
would do. She heard him speak of leasing the land, and
never heard him, in any of the conversations, claim to
hold the land in any way except as a tenant. She took
charge of the books about 1898, and in the fourteen years
since she had never known her father to go to that old
''secretary,'' and get a note or mortgage or any kind
of paper. He kept his papers in the desk where he kept
his books in his office, and in his iron safe.

Two rent notes were produced and identified by this
witness, and they read as follows: ''5-3-1907. On November 1, next, I promise to pay to the order of L. W.
Monroe, $200 for place known as Gayner Gray place, rent
for 1907.''

''February 9, 1910. On November 15, next, I promise to pay to the order of L. W. Monroe the sum of $216,
this being the rent for the present year of the southwest
quarter of section 23, township 1 north, range 9 west.''

When Pettus signed the rent note for 1911, he said
nothing about claiming to own the property.

It was shown that the rent notes dated January 15,
1890, 1891, 1892, 1893 and 1894, had endorsed across each
note in red ink the following: ''This note is given for
rent of the southwest quarter of section 23, township 1
north, range 9 west, or interest on the purchase money.''

Another witness, daughter of Major Monroe, testified that in the spring of 1910, in a conversation she
heard between Pettus and her father, her father told
Pettus that he wanted all things settled up, and asked
Pettus to bring the papers, and Pettus said, ''All right,

Major, I will try to look it up.'' And in none of the conversations that she heard did Pettus ever claim that he was holding the place under contract. This witness also testified that her father kept no live papers in the old ''secretary.''

Pettus, recalled, stated that if Monroe made the statement that Fletcher testified he did, that he (Pettus) never heard it. He also denied that he spoke to Mr. Fletcher down on the place. He further stated that when he gave the rent note for 1910, Monroe never said anything about his having broken the contract, and that he wanted the land back.

The court found that there was due from Pettus on the contract, including taxes, $1,789.39, and that plaintiff, having paid said amount into court for the use and benefit of the defendants, the court decreed that the title be divested out of the heirs of L. W. Monroe, and be vested in the plaintiff.

*J. H. Harrod* and *M. E. Dunaway,* for appellants.

The finding and decree of the court is clearly against the preponderance of the evidence. Long before the death of Major Monroe, Pettus abandoned the contract of purchase, and continued thereafter to hold the land as tenant. The case is here for trial *de novo.* The decree should be reversed and the cause dismissed. 98 Ark. 459.

*Trimble & Trimble,* for appellee.

1. The evidence clearly shows that there had been a sale and purchase of the land, and afterward a waiver of forfeiture on the part of Major Monroe. It devolved upon appellants to show by a clear preponderance of the evidence that Pettus had forfeited his contract; otherwise they are precluded from enforcing the forfeiture. 1 Pomeroy, Eq. Jur., 452; 59 Ark. 405; 75 Ark. 410; 83 Ark. 524; 87 Ark. 393; 89 Ark. 204; 102 Ark. 83.

2. There was never an abandonment by Pettus. 1 Cyc. 4; *Id.* 5; 59 Mont. 558.

3. If there was a contract of lease such as is re-

ferred to by Mrs. Elcan, there was no instrument of
writing from Pettus to Monroe releasing the original
contract of purchase, and, Pettus, being in possession of
the premises, it falls within the statute of frauds, and
is not enforcible.  Kirby's Dig., § 3654, subdiv. 4; Brown
on Statutes of Fraud, § 229; 91 Ark. 140; Smith on Law
of Fraud, § 363; 106 Ark. 332.

*J. H. Harrod* and *M. E. Dunaway,* in reply.

1. If plaintiff *abandoned* his contract, no proof of
cancellation is required.

2. The notes given in 1907 and 1910 for rent are
*written contracts of tenancy,* and comply in all respects
with the requirements of the statute of frauds that the
cancellation must be in writing.

WOOD, J., (after stating the facts).  Appellee, by
this suit, seeks specific performance of a contract for
lease of land with option to purchase, which was entered
into more than twenty-two years before the suit was
brought, and about eighteen years after the contract had
expired by its own terms.  Appellee contends that at the
expiration of the time for the performance of the con-
tract, the forfeiture for a noncompliance with its terms
on his part to pay the purchase money was waived, and
that the contract was continued under an oral agreement
with the vendor to allow appellee to remain in possession
under the same terms for another five years, and at the
expiration of that time that there was another waiver
and a continuance of the contract for another five years,
and so on until this suit was instituted, and that the time
to which the contract had been extended by an oral agree-
ment with Monroe, the owner of the land, had not expired
at the time appellee instituted this suit.  At the time the
contract expired, appellee had not paid any of the prin-
cipal of the note for the purchase money.

In *Meigs* v. *Morris,* 63 Ark. 100, we held (quoting
syllabus): "In order that a court of equity may exer-
cise its power to decree specific execution of a contract
to convey land when there has been a part performance
thereof, the proof of such contract must be clear and

unambiguous, and must be either admitted or proved with a reasonable degree of certainty."

The written contract between Monroe and the appellee having expired, the effort by the appellee is to extend it by parol agreement, and the rule above announced applies.

It could serve no useful purpose to discuss at length the evidence in the case. It is purely a question of fact as to whether appellee and Monroe abandoned the contract upon the failure of appellee to pay for the land, and whether, after its expiration, they agreed to enter upon a contract for leasing the lands to the appellee without an option to purchase.

We are of the opinion, after a careful consideration of the testimony, that a decided preponderance of the evidence shows that the contract giving appellee the option to purchase the land was abandoned, if not before, at least on the 12th day of December, 1901, for, on that date, it appears from the entries made in the books of Monroe by the bookkeeper, that there was a balance of $846.29 due from appellee to Monroe that was dropped from his account; that same was never paid to Monroe, or any part of it, and that after that time Pettus was never charged with any taxes on the land. It is unreasonable to conclude that Monroe would have cancelled this debt which was due him on the purchase of the land if he still intended to treat the contract for the sale of the land to appellee as in force; and the fact that after that time, no taxes were charged against him, which, under the contract, he was required to pay if the same was continued in force, shows that the contract for the sale had been abandoned. The fact, too, that there had been no improvements put upon the land by the appellee for ten years prior to the institution of the suit, tends strongly to show that appellee had abandoned his claim to ownership of the land; and the fact, established by the uncontroverted evidence, that this contract and note, yellow with age, had been relegated to the old "secretary," where none of the live and valuable notes and papers of

Monroe were kept, tends to prove that he didn't regard the original contract as any longer in force. And a circumstance which we regard as most cogent in establishing the abandonment of the original contract, and the entering upon a contract for the lease of the land by the parties thereafter, is the entry made by the bookkeeper of Monroe in his ledger between January 17 and August 7, 1905, as follows: "To rent above land for 1905, $250. Pettus leased above land for five years for $250 a year, and he is to keep up the place and pay taxes." This entry at that time shows clearly that the parties had abandoned whatever contract for sale there might have been, and had entered upon a lease for five years. Then, too, the notes that were in evidence, which were executed when the contract was entered into, under the express terms thereof, and by the endorsement thereon, showed that they were given "for rent or interest on purchase money." But such of the notes as were in evidence, that were executed after the expiration of the contract specified that they were given "*for rent,*" omitting the words, "or interest on purchase money."

The above testimony, showing circumstances about which there is no dispute, and the testimony in the nature of documentary evidence, taken in connection with the testimony of other witnesses, shows clearly that Monroe and appellee, long before Monroe's death, had treated the original contract for option to purchase as rescinded, and that appellee was holding the land as Monroe's tenant, and not as purchaser. The contract having expired without appellee's having exercised his option to purchase, as the proof shows, and appellee having thereafter continued in possession as tenant, and not as purchaser, he can not successfully invoke the statutes of fraud against appellants, for these facts show that there was no equitable title in appellee.

The decree is therefore reversed and the cause is remanded with directions to dismiss the complaint for want of equity.